## JAMES O. KING EXR., ETC., v. ESTHER KING.

CONTRACTS IN RESTRAINT OF MARRIAGE ARE VOID.

> Where a person enters the employ of another under a contract in which such person agrees to take care of the latter during his lifetime, and further agrees to refrain from marriage during her lifetime, in consideration that the latter would provide for the former while she lived with him and at the time of his death: *Held*, that the element in the contract providing that the former should refrain from marriage during her lifetime made it a void contract as against public policy, and, therefore, there can be no recovery upon . such contract.

ERROR to the Court of Common Pleas.

CALDWELL, J.

· James O. King, executor of the last will of James Howland, v. Esther King, comes into this court on error from the court of comon pleas.

The petition set up that Esther King,—and the petition, in fact, shows, that Esther King, when she was, perhaps, sixteen years old and living with her parents at home, was applied to by James Howland who was the uncle of her mother, to have Esther go and live with him and keep house for him during the rest of his life. He had, just previous to that,

lost his wife. Howland was a man well advanced in years at that time, and Esther was a girl, perhaps, fifteen or sixteen years old.

There is set up in the petition, and proved in the evidence, a contract under which this was done. The contract in the first place seems to have been made with Esther and her mother and her father; the talks were with each one separately, and the contract shows that she was to go and live with Mr. Howland and take care of his house and take care of him during his life-time, and that he would provide for her bountifully while she lived with him and at the time of his death. And there is evidence showing that that "bountifully" was, that he would give her the great bulk of his property. And the contract shows clearly, and is so set up in. the petition, that this girl was to refrain from marriage during her life-time, as it is set up in the petition, and some of the witnesses swear to it. That probably might be intended to mean during his life-time, but it is set up in the petition, "during her life-time."

She went and lived with her uncle until he died; and she performed the services faithfully in taking care of him, which, during part of this time was matter of great unpleasantness for the reason that he had running sores upon his body that had to be dressed and there was great danger of her life in dressing those sores, as some of the experts say in the testimony.

It is sought to reverse this case on several grounds; First, because the judgment is too large. She recovered a judgment in the court below, of ten thousand dollars. And there are other matters that I will not even name at this time, but I will come directly to the question that has absorbed the attention of the court almost wholly.

It is claimed that the court erred below, wherein he charged the jury. that if they found this contract had been proved and they found that the girl had performed the services agreed on during the life of James Howland, which services extend through fiteen years,—and it was claimed that he renewed this contract with her after she became of age, so that it became her contract directly,—and if they found those facts to exist, then they might give her upon that contract, what she would be entitled to, considering his estate, the size of it, and all the circumstances of the case.

Now, the contention is that that was error upon the part of the court below, because this was a void contract, that the element that she would refrain from marriage during her life made it a void contract as against public policy.

We find the rule laid down away back in England, in the early judgments of the courts in England, that such a contract was a nullity as against public policy, and, by one of the eminent judges of England, it was pronounced as the blackest of politcal crimes.

Of course it is a policy of every Nation that the human race should be reproduced, that there should be a continuation of birth of children, it is essential to the existence of the race and of the Nation, and this doctrine is founded upon that public policy.

Now there are a great many adjudications along through England; and, after the United States courts were established, there are a great many decisions in the United States courts; and this doctrine has been adhered to with certain modifications. One of the modifications that has received the greatest amount of attention is where a testator wills to his widow or to his wife a certain amount of property during her widowhood or while she shall remain unmarried or language to that effect.

That is made an exception, and it is made upon the ground, by all the authorities, that I have examined—and I think I have seen nearly every thing upon that subject: it is made an exception, and yet not an excep· tion, to the rule that a restraint of marriage is against public policy. The courts hold that that is simply a limitation; that it is given to her during a certain time while she shall remain in a certain *status* and, when she changes that *status* or position in life, the gift is no longer to remain hers; being given upon a limitation, it expires by force of its own language, the limitation being placed in the gift itself.

Of course, it occurs to any one reading these decisions—must necessarily occur to any one, that, after all, there is lying in such a gift an inducement upon the party not to marry, and, so far as that inducement goes, it must be against the rule of public policy that has been established by the courts. However, the courts ignore that element of the matter entirely, and place it upon the ground I have already stated. Certain judges, in commenting upon this part of the law pertaining to gifts of the nature I have spoken of, say, in commenting by way of sarcasm almost, that there is no public policy against restraining a widow from marrying or any person from marrying a second time, but that it is against public policy to restrain one, who has never been married, from marrying at all. And we see this line of criticism going against this class of cases, and, yet the court, offering the criticism goes on and follows the old rule and adheres to it strictly in its decision.

Other limitations have been made upon the general rule in these words —The courts have said that a reasonable restraint will be permitted; if a man gives to his daughter a certain gift based upon the condition that she shall not marry a certain person, that has been held good as it is not an entire restraint of marriage; that she shall not marry into a certain family, has been held good; that she shall not marry a person of a certain nationality, has been held good, so that the rule has been encroached upon to that extent but it has been done purely upon the ground that the rule is a good one and must be adhered to but that the restraint is not such but that the person may have an abundant opportunity to marry although she may not choose any one out of the whole class of men living. Other encroachments have been made upon it much in the same lines but the authorities are all unanimous, so far as I have seen them, that any restraint, however short in time though it be a year or two years or three years, is against public policy and against the rule and the contract will be void under the rule of public policy. So that it is impossible to say that the court was right on the ground that this contract was only for a short time. She agreed to take care of her mother's uncle during his life-time and during that time she would refrain from marriage. Now he might have died the next week; he might have died in a month or in a year; but, as a matter of fact he did not die until fifteen years after this contract was made. It was, then, not a contract to refrain from marriage for a month or for a week, but during his life-time: and, as the contract shows, his life-time was fifteen years from the time she went to live with him.

That being true, the contract can only be considered in the light of what developed under it.

We have seen this rule of public policy criticised. It is criticised in Maryland. It is criticised in New Hampshire. It is criticised in three or four of the other states, by other courts, and yet the very courts that criticise it and say that the rule of public policy that was once adhered

to so tenaciously by Nations many years ago that the rule for holding that doctrine is not now so important as it was at that time.    And perhaps any reason for holding it in every case as if you should make a law that no one should marry in a certain country, it would be the ruin of the country if the rule was adhered to; and yet a contract, no matter however limited it may be in its operation on the two individuals, it has in mind that public policy and although it may have become so that it is no longer essential that that rule should be carried out in contracts on so limited a scale, yet the very courts that have criticised it; have all adhered to it, and, while there is an abundance of authority in the states, in the 80's as I have seen them, and two in the 90's.    They are all adhering to the doctrine that this rule of public policy will make any contract void of the nature of the one under consideration.

This contract was an absolute contract, that, during this time, she would not marry.    That was a part of the consideration.

Now, it is said in the brief filed by counsel, and in the argument also, that here were two considerations—one that she would not marry, and the other that she would perform these services for him.    It is said that that can be separated and that we can allow the one to stand although the other does not.

We think it is clearly established under the laws of this state, by decisions of our Supreme Court that where the consideration is a unit that the party was to render for these two considerations, there can be no separation by the court.    I will not stop to refer to these decisions I presume they are familiar to the attorneys.

That being true, there can be no separation in this matter and the illegal element in the contract goes to the entire contract.

We thought, at the beginning of this case that we would be a little heroic and establish the doctrine that some of the courts hint at as being the proper doctrine in a case of this kind, and we are quite inclined to be pioneers in that direction; but, after the very careful examination of the authorities and seeing how closely the courts in all the states around us, though there is no decision in this state, it is, perhaps, better knowing that there is really some principle at the bottom of this whole thing of public policy, because if this contract could be sustained and held as valid, then, why not a law that would accomplish the same thing?    Why not a multitude of contracts springing up at once, there is no telling what it might lead to.

And we have finally concluded not to be quite so heroic, and simply say that we will follow the long line of precedents established as to cases of this character, and say that this petition sets up no cause of action in the contract alleged, from the fact that it sets up no valid contract but the void one, and there can be no recovery upon the contract in this case, and the judgment therein will be reversed.

*Smith & Blake*, for plaintiff in error.

*J. F. Clarke* and *I. T. Ingersoll*, for defendant in error.